**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge Christine M. Arguello**

Civil Action No. 16-cv-01083-CMA

MOLLY MIDYETTE,

      Applicant,

v.

RICK RAEMISCH, Executive Director, Colorado Department of Corrections, and
CYNTHIA COFFMAN, Attorney General, State of Colorado,

      Respondents.

---

## ORDER DENYING PETITION FOR HABEAS CORPUS

---

The matter before the Court is an Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 filed by Applicant through counsel.   (Doc. # 1.)   The Court has determined it can resolve the Application without a hearing.   *See* 28 U.S.C. § 2254(e)(2); Fed. R. Governing Section 2254 Cases 8(a).

## I. BACKGROUND

Applicant was convicted of three counts of child abuse resulting in death.   *See* (Doc. # 9-2) (*People of the State of Colo. v. Midyette*, No. 11CA2441, 3 (Colo. App. May 15, 2014.)   In the Colorado Court of Appeals' denial of Applicant's Colorado Rule of Criminal Procedure 35(c) postconviction motion, the Colorado Court of Appeals summarized the underlying facts of the criminal case as follows:

Defendant and her husband brought their infant son to the hospital with seizure-like behavior, gray coloring, and a hardening soft spot on his head. The child died one week later after having been taken off of life support. The medical providers suspected child abuse and contacted the Boulder County Department of Social Services. While defendant and her husband were still at the hospital, a social worker told them that a dependency and neglect case would be filed.

After the coroner ruled the cause of death to be a brain injury from nonaccidental trauma, a grand jury indicted defendant and her husband for felony child abuse resulting in death. The indictment was returned fourteen months after the child had died. Defendant was charged only on the theory that although her husband had harmed the child, she was responsible because she had seen obvious indicators of abuse but had failed to remove the infant from the abusive situation or otherwise protect him.

Defendant and her husband were tried separately, with defendant's trial taking place first. A jury convicted her on three counts of child abuse resulting in death.

(Doc. # 9-2 at 2–3.)

On May 16, 2016, Magistrate Judge Gordon P. Gallagher directed Respondents to file a Pre-Answer Response and to address the affirmative defenses of timeliness under 28 U.S.C. § 2254(d), and exhaustion of state court remedies under 28 U.S.C. § 2254(b)(1)(A), if Respondents intended to raise either or both in this action. (Doc. # 3.) Respondents filed a Pre-Answer Response on July 5, 2016. (Doc. # 9.) Applicant did not reply to the Response. The Court reviewed the Pre-Answer Response and filed an Order to Dismiss in Part and for Answer on December 13, 2016. (Doc. # 14.) In the December 13 Order, the Court determined that two of Applicant's four claims, Claims One and Four, were procedurally defaulted and barred from federal habeas review. (*Id.* at 7.)

Respondents were directed to file an answer in compliance with Rule 5 of the Rules Governing Section 2254 Cases that fully addresses the merits of Claims Two and Three, (*id.*), which they did on February 9, 2017 (Doc. # 19). Applicant was granted two

extensions of time to reply. (Doc. ## 21, 23.) Applicant filed a Reply on May 11, 2017. (Doc. # 24.) After reviewing the Application, the Answer, the Reply, and the state court record, the Court concludes that the Application should be denied and the case dismissed with prejudice for the following reasons.

## II. HABEAS CLAIMS

The remaining claims for review on the merits, Claims Two and Three, are as follows:

(2) Trial counsel, Mr. Truman, had insufficient time to prepare and failed to i.) object to experts' testimonies; ii) distinguish between medical and legal child abuse; and iii.) object to a statement made by the prosecution during closing; and

(3) Co-counsel failed to state the theory of defense during opening statement and stated family and friends would be called at trial to testify on Applicant's behalf, which was not done, and Mr. Truman did not present a theory of defense until closing argument, at which time he called Applicant a liar.

(Doc. # 14 at 2.)

## III. LEGAL STANDARDS

Section 2254(d) provides that a writ of habeas corpus may not be issued with respect to any claim that was adjudicated on the merits in state court, unless the state court adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Court reviews claims of legal error and mixed questions of law and fact pursuant to 28 U.S.C. § 2254(d)(1). *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir.

2003). The threshold question pursuant to § 2254(d)(1) is whether Applicant seeks to apply a rule of law that was clearly established by the Supreme Court at the time her conviction became final. *See Williams v. Taylor*, 529 U.S. 362, 390 (2000). The "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the prisoner's claim on the merits." *Cullen v. Pinholster*, 563 U.S.170, 181 (2011). "Finality occurs when direct state appeals have been exhausted and a petition for writ of certiorari from this Court has become time barred or has been disposed of." *Greene v. Fisher*, 565 U.S. 34, 39 (2011) (citing *Griffith v. Kentucky*, 479 U.S. 314, 321 n.6 (1987)).

Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. Furthermore,

> clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008).

If there is no clearly established federal law, that is the end of the Court's inquiry pursuant to § 2254(d)(1). *See id.* at 1018. If a clearly established rule of federal law is implicated, the Court must determine whether the state court's decision was contrary to or an unreasonable application of that clearly established rule of federal law. *See Williams*, 529 U.S. at 404–05.

> A state-court decision is contrary to clearly established federal law if: (a) "the state court applies a rule that contradicts the governing law set forth in Supreme Court cases"; or (b) "the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and

4

nevertheless arrives at a result different from [that] precedent." *Maynard* [*v. Boone*], 468 F.3d [665,] 669 [(10th Cir. 2006)] (internal quotation marks and brackets omitted) (quoting *Williams*, 529 U.S. at 405). "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.' " *Williams*, 529 U.S. at 405 (citation omitted).

A state court decision involves an unreasonable application of clearly established federal law when it identifies the correct governing legal rule from Supreme Court cases, but unreasonably applies it to the facts. *Id.* at 407–08. Additionally, we have recognized that an unreasonable application may occur if the state court either unreasonably extends, or unreasonably refuses to extend, a legal principle from Supreme Court precedent to a new context where it should apply. *Carter* [*v. Ward*], 347 F.3d. [860,] 864 [10th Cir. 2003] (quoting *Valdez* [*v. Ward*, 219 F.3d [1222] 1229-30 [10th Cir. 2000]).

*House,* 527 F.3d at 1018.

The Court's inquiry pursuant to the "unreasonable application" clause is an objective one. *See Williams*, 529 U.S. at 409–10. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather that application must also be unreasonable." *Id*. at 411. "[A] decision is 'objectively unreasonable' when most reasonable jurists exercising their independent judgment would conclude the state court misapplied Supreme Court law." *Maynard*, 468 F.3d at 671. In addition,

evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. [I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks and citation omitted). The Court "must determine what arguments or theories supported or . . . could

have supported[ ] the state court's decision" and then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id*. at 102. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citation omitted). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102–03 (internal quotation marks and citation omitted).

Under this standard, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Maynard*, 468 F.3d at 671. Furthermore,

> [a]s a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 103.

The Court reviews claims of factual errors pursuant to 28 U.S.C. § 2254(d)(2). *See Romano v. Gibson*, 278 F.3d 1145, 1154 n. 4 (10th Cir. 2002). Section 2254(d)(2) allows a court to grant a writ of habeas corpus only if the state court decision was based on an unreasonable determination of the facts in light of the evidence presented. Pursuant to § 2254(e)(1), the Court must presume that the state court's factual determinations are correct, *see Sumner v. Mata*, 455 U.S. 591, 592–93 (1982), and Applicant bears the burden of rebutting the presumption by clear and convincing evidence, *see Houchin v. Zavaras*, 107 F.3d 1465, 1470 (10th Cir. 1997). "The standard

is demanding but not insatiable . . . [because] '[d]eference does not by definition preclude relief.' " *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)).

A claim, however, may be adjudicated on the merits in state court even in the absence of a statement of reasons by the state court for rejecting the claim. *Richter*, 562 U.S. at 98. ("[D]etermining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning"). Furthermore, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id*. at 99.

In other words, the Court "owe[s] deference to the state court's result, even if its reasoning is not expressly stated." *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999). Therefore, the Court "must uphold the state court's summary decision unless [its] independent review of the record and pertinent federal law persuades [it] that [the] result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented." *Id*. at 1178. "This 'independent review' should be distinguished from a full de novo review of the [applicant's] claims." *Id*. (citation omitted). Likewise, the Court applies the Antiterrorism and Effective Death Penalty Act's ("AEDPA") deferential standard of review when a state court adjudicates a federal issue relying solely on a state standard that is at least as favorable to the applicant as the federal standard. *See Harris v. Poppell*, 411 F.3d 1189, 1196 (10th Cir. 2005). If a claim was not adjudicated on the merits in state court, and if

the claim also is not procedurally barred, the Court must review the claim *de novo* and the deferential standards of § 2254(d) do not apply. *See Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004).

### IV. ANALYSIS

Both Claims Two and Three assert ineffective assistance of trial counsel.

It was clearly established when Applicant was convicted that a defendant has a Sixth Amendment right to the effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). Ineffective assistance of counsel claims are mixed questions of law and fact. *See id.* at 698.

To establish that counsel was ineffective, Applicant must demonstrate both that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance resulted in prejudice to her defense. *See id.* at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. "A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within a wide range of reasonable professional assistance." *United States v. Rushin*, 642 F.3d 1299, 1306 (10th Cir. 2011) (citations and internal quotation marks omitted). It is Applicant's burden to overcome this presumption by showing that the alleged errors were not sound strategy under the circumstances, *see Strickland*, 466 U.S. at 689, and that the errors were so serious that "counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment," *Rushin*, 642 F.3d at 1307 (quoting *Richter*, 562 U.S. at 104) (emphasis, citation, and internal quotation marks omitted). Applicant bears the burden of rebutting this presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Applicant must show

counsel failed to act "reasonab[ly] considering all the circumstances." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Strickland*, 466 U.S. at 688).

If Applicant fails to satisfy either prong of the *Strickland* test, the ineffective assistance of counsel claim must be dismissed. *See Strickland*, 466 U.S. at 697. Pursuant to § 2254(e)(1), the factual findings of the state courts are presumed correct. Finally, conclusory allegations that counsel was ineffective are not sufficient to warrant habeas relief. *See Humphreys v. Gibson*, 261 F.3d 1016, 1022 n.2 (10th Cir. 2001).

Under the prejudice prong, Applicant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In assessing prejudice under *Strickland* the question is whether it is reasonably likely the result would have been different. *Richter*, 562 U.S. at 111. "The likelihood of a different result must be substantial, not just conceivable." *Id.* at 112 (citing *Strickland*, 466 U.S. at 693.)

Furthermore, under AEDPA, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether trial counsel's performance fell below *Strickland's* standard," which is the question asked "on direct review of a criminal conviction in a United States district court." *Richter*, 562 U.S. at 101. When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." *Id.* at 105.

## A. CLAIM TWO

Applicant asserts in Claim Two that Mr. Truman, her trial attorney, was ineffective because he had insufficient time to prepare for medical and lay witnesses. (Doc. # 1 at 85.) In particular, Applicant contends that Mr. Truman had tried eight other felony trials between May 8, 2007, when Applicant was indicted, and December 11, 2007, when her trial started, and had to read over 17,000 pages of discovery, which included complex medical discovery. (*Id.*) Applicant further contends that she spent three days a week, five to eight hours each time, studying the materials at Mr. Truman's office, but he was never reviewing the materials when she was there. (*Id.* at 86.) Applicant also contends that, based on the fees he charged after she was indicted, he should have spent 720 hours on the case, but he has no accounting of the time he spent on Applicant's case, which at most could be only 120 hours. (*Id.*)

Applicant argues that Mr. Truman should have requested a *Shreck* hearing, litigated the fact that the prosecution experts could not opine on legal child abuse, and asked for appropriate jury instructions. (*Id.*) Applicant further argues that Mr. Truman did not understand the difference between legal and medical child abuse and this lack of understanding prejudiced her. (*Id.*) Applicant concludes that the jury heard over and over again from prosecution witnesses that the baby's death was a result of child abuse, but due to Mr. Truman's ineffectiveness the jury was not told that medical child abuse "does *not* mean" Applicant was criminally culpable. (*Id.* at 87.)

Applicant relies on the Colorado Court of Appeals' holding in *People v. Rector*, 226 P.3d 1170, 1174–75 (Colo. App. 2009), that the trial court must determine if proffered expert testimony satisfies Colorado Rule of Evidence 702. (Doc. # 1 at 88.) Applicant

further contends expert testimony that a child's injuries constituted "child abuse" can invade the function of the jury. (*Id.*) Applicant acknowledges, however, that *Rector* was not decided at the time of her trial, but argues *Rector* was based on well-established law, which trial counsel should have researched. (*Id.* at 93.) Applicant also acknowledges that *Rector* was reversed by the Colorado Supreme Court, but claims the Court did not overrule any law on the distinction between medical and legal child abuse. (*Id.*)

Applicant sets forth alleged examples of Mr. Truman's failure to object or comprehend the distinction between a medical diagnosis of child abuse and the legal offense of child abuse, which include:

1) The DA's opening statement;

2) Dr. Meyer's testimony admitted without a *Shreck* hearing;

3) Stipulation to Dr. Hay's testimony without a *Shreck* hearing;

4) No objection to the DA's leading question of Dr. Siegfried;

5) Stipulation to Dr. Manchester's testimony without a *Shreck* hearing;

6) Stipulation to Dr. Fries' testimony without a *Shreck* hearing and did not object to certain testimony;

7) Stipulation to Dr. Winston's testimony without a *Shreck* hearing;

8) Stipulation to Dr. Chiesa's testimony without a *Shreck* hearing; and
9) Stipulation to Dr. Jenny's testimony and failure to object to certain testimony.

(*Id.* at 89–92.)

Applicant also argues Mr. Truman conceded her criminal culpability by stipulating to Drs. Jenny's and Chiesa's testimonies that, not only did the baby die of head trauma,

11

the trauma was inflicted intentionally by a child abuser.  (*Id.* at 92.)   Finally, Applicant

contends that Mr. Truman failed to object to the prosecutor's misconduct during closing

rebuttal, when the prosecution stated that the jury could find Applicant guilty of knowingly

causing the injuries because there was no explanation for the baby's death.   (*Id.* at 94–

95.)

The Tenth Circuit has found that in applying the *Strickland* standard, considerable

deference is given to "an attorney's strategic decisions and recognize that counsel is

strongly presumed to have rendered adequate assistance and made all significant

decisions in the exercise of reasonable professional judgment."   *Schreibvogel v. Wyo.*

*Dep't of Corrections State Warden*, 549 F. App'x 805, 808 (10th Cir. 2013) (quoting

*Bullock v. Carver*, 297 F.3d 1036, 1044 (10th Cir. 2002)).

"The duty to investigate derives from counsel's basic function . . . to make the

adversarial testing process work in the particular case."   *Williamson v. Ward*, 110 F.3d

1508, 1514 (10th Cir. 1997) (internal quotation marks and citations omitted).   "[C]ounsel

has a duty to make reasonable investigations or to make a reasonable decision that

makes particular investigations unnecessary."   *Id.* (internal quotation marks and citations

omitted).   "[S]trategic choices made after less than complete investigation are

reasonable precisely to the extent that reasonable professional judgments support the

limitations on investigation.   In other words, counsel has a duty to make reasonable

investigations or to make a reasonable decision that makes particular investigations

unnecessary."   *Strickland*, 466 U.S. at 690–91.   "Counsel [is] entitled to formulate a

strategy that [is] reasonable at the time and to balance limited resources in accord with

effective trial tactics and strategies."   *Richter*, 562 U.S. at 107.

12

The Court will address the arguments in Claim Two below.

1. Insufficient Time

This Court has reviewed the 1800-page transcript of the Rule 35(c) postconviction hearing. Applicant, her parents, Mr. Truman, medical and psychological experts who were trial witnesses, a psychological expert who interviewed Applicant postconviction, another expert who reviewed the validity of the expert's postconviction interview of Applicant, codefendant's trial attorney, and a standard of care expert regarding Mr. Truman's effectiveness testified at the postconviction hearing. The evidence Applicant presented at the postconviction hearing, and she relies on in this action, must meet the burden of providing clear and convincing evidence that rebuts the presumption that the state court's factual determinations are correct. *See* 28 U.S.C. § 2254(e)(1). Applicant must show counsel failed to act reasonably considering all the circumstances. *Cullen*, 563 U.S. at 189.

Applicant's basis for asserting Mr. Truman could not have properly prepared for trial is speculative at best. He testified on cross-examination at the postconviction hearing that he did have ten trials during the year Applicant's trial was held, but he was not inhibited by the number of trials and was able to perform at a reasonable and competent level. (Oct. 24, 2011 A.M. Rule 35(c) Hr'g Tr. at 108.) He further testified that the other trials were of various lengths, one being an ethics trial, and that, having been a public defender, he was used to at least six to seven trials per year. (*Id.*) Mr. Truman also testified that he hired another attorney, had an investigator conduct a "bunch of investigation," and hired some expert witnesses. (*Id.*) He further stated that his preparation for this case included reading the discovery and grand jury transcripts, as did

13

other members of the "team," which included the other attorney and investigator. (*Id.* at 109.) He confirmed on redirect that he read all 10,364 pages of discovery. (Oct. 27, 2011 Rule 35(c) Hr'g Tr. at 42.) Applicant also was required to read the discovery and to engage in discussions about the discovery, which she did with Mr. Truman. (Oct. 24, 2011 A.M. Rule 35(c) Hr'g Tr. at 109–10.)

Mr. Mulligan, Applicant's standard of care expert, agreed on cross examination that the results Mr. Truman obtained in the other cases he litigated in 2007, overall, were very good, including the mistrial, hung jury, deferred judgment, but especially the two acquittals. (Nov. 15 Rule 35(c) Hr'g Tr. at 131–37.) Mr. Mulligan further agreed that the number of interviews with Applicant prior to trial were sufficient and to his knowledge Mr. Truman was never unavailable to Applicant. (*Id.* at 138–39.) Finally, Mr. Mulligan testified that it would be difficult for Mr. Truman to review all 10,000 pages plus of discovery in Applicant's case, with the complex medical issues, even without litigating other cases at the same time; but he conceded that in private practice an attorney can control his calendar and Mr. Truman's co-counsel and investigator could have mitigated the difficulty in adequately preparing for Applicant's case. (*Id.* at 31, 40.)

In reviewing the trial court's order addressing Applicant's ineffective assistance of counsel claim, the Court finds that the trial court and the Colorado Court of Appeals acknowledged Applicant's insufficient time claim. *See* (Doc. # 9-3 at 11; Doc. # 9-2 at 10–11.) Nonetheless, the trial court did not specifically address this claim, nor did the Colorado Court of Appeals. As stated above in the Legal Standards section of this Order, a claim may be adjudicated on the merits in state court even in the absence of a statement of reasons by the state court for rejecting the claim. *Richter*, 562 U.S. at 98

("[D]etermining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning").

It appears, however, that the trial court and the Colorado Court of Appeals found the insufficient time issue unsupported by other findings of Mr. Truman's effectiveness, which are addressed below. (Doc. # 9-3 at 11–14; Doc. # 9-2 at 18–21.)

Trial counsel is strongly presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment. *Schreibvogel*, 549 F. App'x at 808. Applicant has not demonstrated by clear and convincing evidence that there is a reasonable probability that, but for the alleged lack of sufficient time to prepare, the result of the trial would have been different. *See Strickland* at 694. Even if Mr. Truman was ineffective, Applicant fails to assert how she was prejudiced by Mr. Truman's lack of time.

## 2. Legal v. Medical Child Abuse

As stated above, Applicant contends that Mr. Truman was ineffective because he did not understand the difference between legal and medical child abuse and this lack of understanding prejudiced her. (Doc. # 1 at 87.) Applicant contends the jury heard over and over again from prosecution witnesses that the baby's death was a result of child abuse, but due to Mr. Truman's ineffectiveness the jury was not told that medical child abuse "does **not** mean" Applicant was criminally culpable. (*Id.*)

In addressing this claim, the Colorado Court of Appeals found:

> Defendant identifies four possible theories for what happened to her son:

1. The child's death resulted from a medical condition and not child abuse, which was the theory defendant's husband advanced at his trial (the medical defense);

2. Defendant's husband abused the child but defendant could not have known what was happening, because she left the infant in her husband's care to go to work (the "Molly could not have known" defense that Truman chose);

3. Defendant's husband was abusing the child and she knew about it, but she failed to act because she had not wanted the child in the first instance (the prosecution's theory); and

4. Defendant's husband abused the infant and she knew about it, but she did not act because she was also a victim of his domestic violence and was controlled by abusive in-laws (the battered woman syndrome defense raised for the first time in her postconviction motion but not reasserted on appeal).

At her postconviction hearing and now on appeal, defendant asserts that Truman should have utilized the medical defense. She argues that to preserve this defense, he should have distinguished between medical and legal child abuse by: requesting a hearing under *People v. Shreck*, 22 P.3d 68 (Colo. 2001), regarding several prosecution expert witnesses who were to give medical opinions concerning "child abuse"; objecting to such testimony during trial; and tendering a jury instruction on the difference between legal and medical child abuse under *People v. Rector*, 226 P.3d 1170 (Colo. App. 2009), *rev'd on other grounds*, 248 P.3d 1196 (Colo. 2011).

But these arguments fail to warrant postconviction relief because they all assume that disputing the cause of death under the medical defense theory would have been a better defense than the "Molly could not have known" theory. Truman's testimony, the testimony of defendant's standard of care expert, and the postconviction court's findings all undercut this assumption.

Truman's decision to adopt the "Molly could not have known" defense was a trial strategy entitled to "great deference." *Dunlap*, 173 P.3d at 1068; *see also Davis v. People*, 871 P.2d 769, 773 (Colo.1994) ("[M]ere disagreement as to trial strategy . . . will not support a claim of ineffectiveness."). Even so, defendant suggests that Truman was so ill-informed and ill-prepared for trial that he could not have made a valid choice as to her defense. *See Davis*, 871 P.2d at 773 (defendant "is

entitled to a pretrial investigation sufficient to reveal potential defenses and the facts relevant to guilt or penalty").

. . . .

But Truman testified that he had read the grand jury transcripts and all of the discovery documents, including the medical records and pathology reports.   He explained that these documents and consultation with medical experts led him to conclude that the medical defense was not "viable." After hiring a medical expert to investigate the case, the expert's theory "didn't answer all the questions that [he] had, while [it] may have answered some of the injuries concerning . . . thrombosis [a medical condition that could have explained some of the injuries], it did not cover any of what the x-rays clearly showed was fracture."   He concluded that "it would be the partial answer to a big question" and "there was no medical defense to all of the injuries in this case."   Therefore, while he and his investigator, who had conducted Internet research on medical causation, considered the medical defense, he "believed that the cause of death by the Boulder County coroner [ruling nonaccidental trauma] was essentially correct."   He also described his knowledge of the difference between medical and legal child abuse, but explained that because a medical defense was not "viable," distinguishing between the two would have been purposeless.

Defendant's standard of care expert agreed that under the chosen theory of the defense, the questions Truman had asked of the prosecution's medical experts were "effective."   The expert acknowledged "a number of occasions where the theme of how could Molly have known was . . . referenced both in cross-examination and ultimately in closing argument." And he described this theory as "the more obvious theory" "given information about the dynamic" of the case, and admitted that it was "appropriate."

Truman's testimony and the expert's opinions support the postconviction court's findings that "Mr. Truman effectively cross-examined all of the doctors" and the defense theory "was a good defense and this Court's observation at trial was that it was well-executed."   The court also found that Truman was "thoroughly prepared for trial" and "understood the issues and the facts."

. . . .

At the postconviction hearing, Truman testified that the decision not to "demonize" defendant's husband from the start was a matter of trial strategy.   He explained that "if we demonize him too badly, we prove the District Attorney's case under another theory"—namely, "Molly knew and, yet, disregarded the baby's health by leaving him there."

On the one hand, in opening statement, the prosecutor said, "Molly Midyette is not charged in this case with inflicting the injury."   The prosecutor repeatedly indicated that the child was with defendant's

husband when the injuries occurred, saying, for example, "when that child is with Alex he keeps having repeated injury." Defendant testified that she had not abused the child. And but for two isolated comments in rebuttal closing argument, discussed in subsection F below, the prosecution never argued that defendant had harmed the infant.

And on the other hand, Truman testified that eliciting testimony from defendant — as she argues that he should have—regarding her husband's cocaine use and his acts of domestic violence against her before the baby's death, would have presented the dilemma of "why Molly Midyette was still living with Alex Midyette and standing by him." *See Dunlap*, 173 P.3d at 1067 ("Presenting a mental health mitigation case would have been risky at best."). Such testimony could also have invited the question on cross-examination of how defendant could possibly have left the infant with him anytime thereafter.

For these reasons, Truman had to choose a strategy that reconciled two competing concerns: suggesting that the husband was the abusive parent, while not giving rise to the inference that defendant must have known the child was being abused. This presented a dilemma from which there was no complete escape because the prosecution's medical experts testified that more than one incident of abuse—the head injury—had occurred; the infant had thirty-seven broken bones. And only defendant and her husband had cared for the infant, except for a single night when the defendant's mother-in-law watched the baby. *See id.* at 1068 ("Trial counsel's strategic decision . . . was made in the face of extraordinarily difficult circumstances.").

And defendant has not identified any "seemingly unusual or misguided action" by Truman that would give us pause in deferring to his trial strategy. *Massaro v. United States*, 538 U.S. 500, 505 (2003). Given the difficult facts of the case and deferring to the postconviction court's findings on Truman's level of preparation, which Truman's testimony supports, his chosen theory of defense is "virtually unchallengeable." *Strickland*, 466 U.S. at 690. Thus, we conclude that because Truman's chosen theory of defense fell within the applicable standard of care, it does not warrant postconviction relief under *Strickland*.

(Doc. # 9-2 at 8–15.)

Nothing Applicant asserts supports how the other three defenses noted above by the CCA, which include a medical defense, would have been a better strategy.

Throughout his testimony at the postconviction hearing on cross-examination, Mr.

18

Truman stated that in preparing for trial he (1) reviewed all discovery and consulted medical experts; (2) considered the medical defense and concluded that there was insufficient evidence to prove legal child abuse; (3) concluded there was no medical defense to all of the injuries; and (4) that the coroner's ruling was correct that the infant's death was caused by nonaccidental trauma.    (Oct. 24, 2011 Post Conviction Hr'g Tr. at 25–141.)    Mr. Truman also testified at the postconviction hearing that, based on Applicant's belief her husband did not harm the baby, he was not able to "demonize" her husband early in the case, because it would raise the question why would Applicant stay with him, and it would upset his client.    (*Id*. at 125.)    Mr. Truman further stated that if Applicant's husband was demonized too badly the prosecution's case is proven by Applicant knowing of the abuse and still leaving the baby with her husband.    (*Id*. at 127.)

Applicant testified at trial that she believed her husband did not injure the baby. (Dec. 20, 2007 Trial Tr. at 77, 213, 240.)    Medical experts testified that the injury was nonaccidental trauma and the evidence was conducive to finding child abuse.    Based on the medical evidence and Applicant's insistence that her husband did not injure the baby, Mr. Truman's strategic decision to elect the Applicant could not have known defense was made in the exercise of reasonable professional judgment.    *Schreibvogel*, 549 F. App'x at 808.

Trial counsel is strongly presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment. *Id*.    Applicant has not demonstrated by clear and convincing evidence that there is a reasonable probability that, but for Mr. Truman's lack of understanding of the difference between legal and medical child abuse, the result of the trial would have been different.

19

*Strickland* at 694.  Even if Mr. Truman was ineffective, Applicant fails to assert how she was prejudiced by Mr. Truman's alleged lack of understanding.

### iii. *Shreck* hearings/*Rector* application

As stated above, Applicant argues that Mr. Truman should have requested a *Shreck* hearing.  (Doc. # 1 at 86.)  Also, as stated above, Applicant contends that based on *Rector*, 226 P.3d at 1174–75, the trial court should have determined if proffered expert testimony satisfies Colorado Rule of Evidence 702 and if expert testimony that a child's injuries constituted child abuse invaded the function of the jury.  Applicant acknowledges that *Rector* was not decided at the time of her trial and was subsequently reversed by the Colorado Supreme Court, but argues *Rector* was based on well-established law, and the Colorado Supreme Court did not overrule any law regarding distinction of medical and legal child abuse, which Mr. Truman should have researched.  (Doc. # 1 at 93.)

In addressing the *Shreck* and *Rector* issues, the Colorado Court of Appeals found as follows:

> Still, defendant argues that even if the trial strategy as a whole was sound, because Truman did not understand the difference between legal and medical child abuse, he was ineffective because he failed to request "a *Shreck* hearing to determine the reliability of any of the opinions regarding child abuse."  To support her assertion, defendant relies exclusively on the opinion of a division of this court in *People v. Rector*.  This argument fails to show ineffective assistance for the following reasons:
>
> • *Rector* was announced after the conclusion of defendant's case; it had been reversed before the postconviction hearing took place; and defendant does not cite any cases other than *Rector* for this proposition.
>
> • Defendant fails to explain why, based on existing law at or before trial, a *Shreck* hearing would have so obviously limited the medical testimony that failure to request such a hearing fell below the standard of care.

• Defendant's expert conceded that under the "Molly could not have known" defense, a *Shreck* hearing is "less significant."

• Defendant did not offer expert testimony at the postconviction hearing that any of the prosecution's expert testimony at trial regarding the cause of death was likely to have been excluded under *Shreck* as scientifically flawed.

• The postconviction court found that "[t]he transcripts of Defendant's jury trial show that Mr. Truman effectively cross-examined all of the doctors, bringing out: Dr. Siegfried's inexperience; that many experienced doctors could misdiagnose the symptoms that baby Jason displayed; and that the first three family practitioners or pediatricians who saw the baby on the day he was hospitalized thought he had meningitis."

• Truman testified that he "didn't believe there was any unique or completely unusual theory of medical practice that the prosecution was putting forward" that would warrant a *Shreck* hearing, because the other medical experts with whom he consulted "said this was pretty much bread and butter stuff and that there was nothing new, novel or unique" about the expert testimony being presented.

These reasons also undercut defendant's assertion that Truman should have objected during trial to any expert testimony that went beyond medical child abuse.  In addition, Truman noted that because of "the low standard for expert witnesses in Colorado" and "all of these experts were clearly qualified," "making an objection in front of the jury about [the experts'] qualification would have been counterproductive."  And regarding the difference between medical and legal child abuse, Truman testified that where, as here, "the injuries were fairly well documented," distinguishing between the two would have been unproductive; the more appropriate emphasis "was simply what did Molly know and when did she know it."

Likewise, because Truman had valid strategic grounds not to seek a *Shreck* hearing or object during trial, those grounds refute defendant's assertion that he was ineffective for failing to tender a jury instruction on the distinction between legal and medical child abuse.  And the theme of his closing argument, discussed in subsection G below, would not have strengthened from such an instruction.

Thus, because Truman's decision not to seek a *Shreck* hearing, to object during trial based on the distinction of the medical and legal

definitions of child abuse, or to tender a related jury instruction fell within the broad standard of care, defendant is not entitled to relief under *Strickland*.

(Doc. # 9-2 at 15–18.)

First, Applicant's claim that Mr. Truman was ineffective for not relying on *Rector* lacks merit. *Rector* was decided after Applicant's trial and Applicant fails to identify any well-established law that existed before or at the time of her trial, which would support a *Rector* finding. Nonetheless, Mr. Truman had valid strategic grounds, as found above, not to object or seek a *Shreck* hearing, or to seek jury instructions regarding a legal and medical child abuse distinction. Also, Mr. Truman's cross-examination of the prosecution's medical experts was adequate. Finally, Applicant's standard of care expert conceded that if the defense theory was that Applicant did not know that her husband committed the acts against the baby then it was "less significant to have a *Shreck* hearing." (Nov. 16, 2011 Postconviction Hr'g Tr. at 65.)

Trial counsel is strongly presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment. *Schreibvogel*, 549 F. App'x at 808. Applicant has not demonstrated by clear and convincing evidence that there is a reasonable probability that, but for Mr. Truman's decision not to seek a *Shreck* hearing, and not to object to the distinction between legal and medical definitions of child abuse, or to seek related jury instructions, the result of the trial would have been different. *Strickland* at 694. Even if Mr. Truman was ineffective, Applicant fails to assert how she was prejudiced by Mr. Truman's decision not to seek a *Shreck* hearing and not to object, or to seek jury instructions.

iv. Prosecutorial Misconduct

As stated above, Applicant contends Mr. Truman was ineffective in not objecting to the prosecution's statement that the jury could find Applicant guilty of knowingly causing the injuries, because there was no explanation for the baby's death.

In addressing this claim, the Colorado Court of Appeals found as follows:

> Defendant next contends Truman was ineffective for his failure to object to misconduct in the prosecution's closing argument that allegedly shifted the burden of proof to the defense. Specifically, she argues that he should have objected when the prosecutor said, "You can believe if you want to that she inflicted those injuries, because we don't have an explanation for those with the soft callus . . . . She may very well be the one who inflicted those injuries." But the prosecutor immediately reiterated its theory that it was not alleging that her violence killed the infant; rather, "[i]t was her failure to act that resulted in his death and you have to hold her accountable for that failure." Where, as here, the improper statements were isolated and immediately followed by a proper characterization of the argument, there is no reasonable probability that they contributed to defendant's conviction based on the totality of the circumstances.

> And even assuming these statements were improper, the pertinent questions under *Strickland* are whether Truman's failure to object was both objectively unreasonable and prejudicial. To fall outside the applicable standard of care, "defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice." *Lundgren v. Mitchell*, 440 F.3d 754, 774-75 (6th Cir. 2006). By contrast, "any single failure to object [to closing arguments] usually cannot be said to have been error." *Id.* at 774. And "not drawing attention to [a] statement may be perfectly sound from a tactical standpoint." *United States v. Caver*, 470 F.3d 220, 244 (6th Cir. 2006).

> Here, the prosecution's evidence showed a badly beaten infant and a mother who at best had left the child with a potentially abusive father. In this context, Truman's decision not to object to the prosecutor's statements avoided drawing the jury's attention to the possible very negative inference available from the evidence—defendant participated in at least some of the abuse. *See Walker v. United States*, 433 F.2d 306, 307 (5th Cir. 1970) (discussing how objecting to prosecutor's alleged improper remarks during closing argument may have been more prejudicial than the remarks from the prosecutor).

In sum, we conclude that Truman's actions either fell within the broad range of reasonable conduct under *Strickland* or that different action would not probably have produced a different outcome.

(Doc. # 9-2 at 29–31.)

Trial counsel is strongly presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment. *Schreibvogel*, 549 F. App'x at 808. Applicant does not assert that Mr. Truman consistently failed to use objections regarding any alleged prosecutorial misconduct. Furthermore, there is clear support that Mr. Truman's decision not to object to the one statement that Applicant may have inflicted the injuries was a proper strategic decision. Applicant, therefore, has not demonstrated by clear and convincing evidence that there is a reasonable probability that, but for Mr. Truman's failure to object to the prosecution's statement during closing regarding the possibility that Applicant may have caused the injuries, the result of the trial would have been different. *Strickland* at 694. Even if Mr. Truman was ineffective in not objecting, Applicant fails to assert how she was prejudiced by Mr. Truman's failure to object.

v. Conclusion

"The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101. Based on the above findings, the Court has determined that the state court's decision to dismiss the ineffective trial counsel claims presented in Claim Two was not contrary to or an unreasonable application of any clearly established rule of federal law as determined by the U.S. Supreme Court or a decision that was based on an unreasonable determination of the

facts. Claim Two, therefore, lacks merit, and Applicant is not entitled to relief in this claim.

## B. CLAIM THREE

In Claim Three, Applicant first asserts that the defense's opening statement fell below the standard of practice for an attorney defending a murder case. (Doc. # 1 at 96.) Applicant contends that co-counsel failed to present a theory of defense and did not tell the jury why it should acquit her. (*Id.*) Applicant also asserts that co-counsel told the jury it would call witnesses but then only called Applicant. (*Id.* at 97.)

Second, Applicant asserts that Mr. Truman failed to mention in closing argument the "how could [Applicant] know" theme and called Applicant a liar for testifying that she never saw her husband harm the baby. (*Id.*) Finally, Applicant contends Mr. Truman also stated during closing that (1) he did not understand why Applicant stayed with her husband and why she continued to state that she believed her husband when he said he did nothing to the baby; (2) the child was abused; and (3) Applicant was charged with knowing her son was being abused, let it happen, and the evidence shows she knew about the abuse. (*Id.* at 97–98.)

The Court will address the challenges to the opening and closing statements below.

### 1. Opening Statement

In addressing the theory of defense and acquittal claim, the Colorado Court of Appeals found as follows:

> Defendant next contends she received ineffective assistance because the opening statement of Truman's co-counsel, according to her expert, "did not state either of those theories [the medical defense or the 'Molly could not have known' defense]." He opined that "the opening

statement provided in this case was an episode of ineffective assistance of counsel" because "the jury heard an opening statement that lacked direction, lacked focus and lacked a theory of defense."

Even so, overall, the trial record does not show that defendant suffered any prejudice as a result of the opening, thus precluding postconviction relief under *Strickland*.

An opening statement is optional. *See, e.g., United States v. Miller*, 907 F.2d 994, 998 (10th Cir. 1990). And waiving opening statement, even when no reasonable explanation exists for counsel's decision to do so, does not constitute ineffective assistance of counsel. *See Clayton v. Gibson*, 199 F.3d 1162, 1178 (10th Cir. 1999). To warrant postconviction relief, the failure to adequately present an opening statement must lead to "an actual breakdown of the adversarial process during the trial of this case." *United States v. Cronic*, 466 U.S. 648, 657-58 (1984).

Here, in opening statement, the prosecutor asserted that defendant "had an absolute duty to protect that child from harm and an absolute duty to seek medical care . . . when she knew that harm had been inflicted," but "[s]he failed" to act. In response, while not explicitly outlining the theory of defense, Truman's co-counsel discussed "the trust that Molly had in her doctor and the other medical professionals that she got advice from." This set the stage for the ultimate defense: the prosecution could not meet its burden of proof because defendant could not have known what was happening to the child.

From the start, the prosecution's theory was that defendant knew of the abuse yet failed to act, which was the thrust of its closing argument. But throughout the trial, the defense team developed the strategy that defendant could not have known of the abuse. Highlighting the theme of "trust" mentioned in opening, Truman elicited defendant's testimony that when she brought the child to the pediatrician and raised an issue regarding his arm that "would just kind of float," the doctor told her that it was "the residual effect of . . . the low muscle tone and it's going to be okay." Similarly, when Truman questioned defendant about subsequent visits to the pediatrician, defendant testified that the doctor thought the hole in the child's gums "wasn't . . . anything to be alarmed about," his previous weight gain issues had improved, and "he was healthy." Truman brought out the testimony that defendant "trusted [the pediatrician], actually, more than . . . the OBGs [sic] that had delivered" the child. The defense also elicited testimony during cross-examination that the doctors who saw the child before his death did not observe indications of child abuse. As the postconviction court found, Truman "effectively cross-examined all of the doctors," highlighting the ease of misdiagnoses given the child's symptoms

and "that the first three family practitioners or pediatricians who saw the baby on the day he was hospitalized thought he had meningitis."

Thus, because "the jury's understanding of, and ability to follow, the defense's case was not hampered," *Hooks v. Workman*, 606 F.3d 715, 729 (10th Cir. 2010), we conclude that the defendant has not shown any prejudice from the purportedly inadequate opening statement.

(Doc. # 9-2 at 22–25.)

In addressing this claim, it is first noted that jurors are presumed to follow the instructions given by the judge. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citation omitted). Here, the trial judge instructed jurors that opening statements are not evidence and are only provided to jurors to help them understand what evidence will be presented. (Dec. 11, 2007 Trial Tr. at 209.) The trial judge further instructed jurors that Applicant did not have to call any witnesses or introduce evidence. (*Id.*)

Second, co-counsel also stated in the opening statement that some of the defense case will come from the prosecution witnesses, who the defense would have called. (Dec. 12, 2007 Trial Tr. at 46.) At trial, counsel cross-examined the prosecution's witnesses to present the defense theory that Applicant could not have known about how her husband harmed the baby.

At the Rule 35(c) hearing, Applicant's standard of care expert agreed that Mr. Truman's cross-examination of the prosecution medical witnesses was adequate based on the theory that Applicant did not know of the abuse. *See* (Nov. 15, 2011 Rule 35(c) Hr'g Tr. at 104.) Applicant's direct testimony was a detailed review of the time after the baby was born. (Dec. 20, 2007 Trial Tr. at 5–87.) Applicant restated throughout her testimony that she (1) followed the doctor's directions; (2) did not see any injury to the baby; and (3) questioned her husband directly if he had harmed the baby. (*Id.*)

27

Applicant stated specifically that she loved her husband and believed that he never would have harmed the baby. (*Id.* at 77.) On redirect, Mr. Truman questioned Applicant regarding the prosecution's questions that may have cast a bad light on Applicant and included questions about her continuing to search for medical reasons for the baby's injuries and about her belief that her husband would not hurt the baby or that she had cause to believe her husband did hurt him. (*Id.* at 227–41.) Mr. Truman also cross-examined friends and family, who attested to Applicant's care of and concern for the baby. (December 13, 2007 Trial Tr. at 243-258; December 14, 2007 Trial Tr. at 30–38, 75–85, 108–12, 155–64, 183–87, 200–03.)

Even if trial Mr. Truman's failure to present friends and family as witnesses at trial, and to state with more specificity a theory of defense during opening statement why Applicant should be acquitted, were found to be below an objective standard of reasonableness, Applicant fails to assert how the performance resulted in prejudice to her defense. The above findings by the Court support both the Colorado Court of Appeals' determination that the jury was able to understand and follow the defense's case. The Colorado Court of Appeals' conclusion that Applicant had not shown any prejudice from the purportedly inadequate opening statement, therefore, was a reasonable application of the *Strickland* standard.

### ii. Closing Argument

As stated above, Applicant asserts that Mr. Truman failed to mention in the closing argument the "how could Applicant know" theme and called Applicant a liar for testifying that she never saw her husband harm the baby. Applicant further contends Mr. Truman also stated during closing that (1) he did not understand why Applicant stayed with her

husband and why she continued to state that she believed her husband when he said he did nothing to the baby; (2) the child was abused; and (3) Applicant was charged with knowing her son was being abused, she let it happen, and this is what the evidence shows. The Colorado Court of Appeals addressed the closing statement as follows:

> Defendant next contends Truman was per se ineffective because he allegedly conceded her guilt in his closing argument by saying:
>
>> She is being charged here with knowing that her boy was being abused and letting it happen or turning a blind eye. That's what she is charged with and *that's what the evidence shows*, not how much she owes on her student loans, not this goofy letter to an ex-boyfriend . . . .
>
> (Emphasis added.) But this obvious misstatement is not the equivalent of conceding defendant's guilt. To do so, the statement would have needed to "rise to the level of [a] judicial admission[] before [it would] be deemed violative of the defendant's rights." *People v. Bergerud*, 223 P.3d 686, 700 (Colo. 2010).
>
> "A judicial admission is a formal, deliberate declaration which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute." *People v. Bertagnolli*, 861 P.2d 717, 720 (Colo. 1993) (internal quotation marks omitted). "In assessing whether a disputed statement constitutes a judicial admission, the statement[ ] should be read as a whole and understood in light of [its] context." *Bergerud*, 223 P.3d at 700.
>
> Looking to the context, in his closing argument, Truman urged the jurors to find defendant not guilty and explained why they should do so. For instance, he closed with:
>
>> At the end of this, I think that you will know that [defendant] couldn't have known. Just as Dr. Jenny [a prosecution expert] said that 31 percent of the trained medical docs couldn't tell a head injury, just as all the docs in this case said they couldn't have seen a thing and would have guessed wrong. If they don't know, how was [defendant] to know? And if she doesn't know, she's not guilty of all these charges. If she doesn't know, she's not guilty and you must find her such.

After examining the entire closing statement, we conclude that Truman did not concede defendant's guilt. Thus, the misstatement does not entitle defendant to relief under *Strickland*.

Still, defendant argues that Truman's closing statement amounted to ineffective assistance based on the following two statements:

> Molly says that she loves [her husband], that she believes him when he says that he did not do anything to this boy, not all of us are like that, not all of us believe that as well. Whether it's out of love or a trauma-bond having gone through this terrible circumstance or any other part that puts these two together, it is not believed by the defense team, and you need to know that . . . .

> The most likely answer is the same answer that the DA has given you, I believe, that this child was abused, and why Molly stays with him is a mystery to me. I wish I understood it. I wish I could tell you. I wish I could change it, but that's not the job of the lawyer.

Defendant's expert testified that such statements are "very, very concerning," because they were "not consistent with the cross-examinations that ha[d] been performed" and provided a sudden change in theme "where [Truman] articulate[d] the defense team not believing their own client." The expert explained that the "mystery" testimony "calls your client's credibility into question and calls into the question the credibility of the defense." For that reason, he opined that Truman "did not provide effective assistance of counsel."

But in context, these excerpts from the closing arguments are ambiguous as to what the defense team disbelieved—defendant's knowledge of the abuse, why she believed her husband's denial of abuse, or her articulated reason for having stayed with him after the child died. Truman explained that, as a defense attorney, credibility in front of a jury is "the most important." He believed defendant's testimony "was not very helpful at trial because she got involved in some of these fine hair splittings [sic] concerning her beliefs." And the trial court found Truman's defense to be "well-executed," including the "theme of an 'aloof' Defendant."

"[I]t is well-settled that the decision to waive . . . closing statement is a commonly adopted strategy, and without more, does not constitute ineffective assistance of counsel." *Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000). In other words, closing arguments reflect an exercise of trial counsel's judgment, and "we cannot fault" an attorney's "attempt[ ] to maintain his credibility and candor with the jury." *Davis*, 871 P.2d at 777.

Even where trial counsel had "candidly acknowledge[d] guilt, concede[d] the heinous nature of the offense, and concentrate[d] instead on convincing the jury of the legitimacy of defendant's mental defenses," "we cannot equate such candor with incompetence" because "good trial tactics demand[ ] complete candor with the jury." *People v. Wade*, 750 P.2d 794, 801 (Cal. 1988) (cited with approval in *Davis*, 871 P.2d at 777) (internal quotation marks omitted).

Thus, we conclude that Truman's statements in closing argument fall within "the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, and do not warrant postconviction relief.

(Doc. # 9-2 at 25–29.)

First, the arguments presented by Applicant regarding Mr. Truman's four remarks made during his closing statement must be reviewed in the context of the complete statement.

Mr. Truman started his closing statement with a reference to the "how could she know" defense theory. (Dec. 21, 2007 Trial Tr. at 51.) He further asked the jury how could anyone doubt that Applicant loved the baby, was grief-stricken and heart-broken, and cared for the baby. (*Id.*) He then reviewed the testimony by medical experts, which he concluded what are the odds with the number of fractures supposedly found that there would not be bruises and if doctors were not able to know about the baby's fractures without any bruising how was Applicant to know. (*Id.* at 52.) Mr. Truman further states that Applicant did not try to hide any information she knew about the baby's actions. (*Id.* at 53.) He further outlined for the jury what information Applicant knew, when she learned the information, and what she did once she had the information. (*Id.* at 53–79.) Mr. Truman concluded that Applicant did everything she was told to do regarding the baby and that she did not know about any possible abuse. (*Id.*)

Mr. Truman did not state that (1) the defense team did not believe Applicant when she asserted she did not know her husband harmed the baby; and (2) they believed she was trying to cover for him.   (*Id.* at 80.)   He disavowed Mr. Kupfner's testimony that Applicant was covering up for her husband and that she knew of the abuse.   (*Id.* at 83.)   The point that Mr. Truman was making during closing is that the defense team, however, does not believe that her husband did not harm the baby.   (*Id.* at 80.)   His statement that he does not understand why Applicant continued to stay with her husband does not diminish his defense theory that Applicant did not know.

Furthermore, regardless of how Mr. Truman's remarks are characterized, they do not state a concession of guilt.   *See, e.g., United States v. Swanson*, 943 F.2d 1070, 1074 (10th Cir. 1991) (defense counsel's statements during closing argument conceding there was "no reasonable doubt" that his client was the perpetrator and that there was "no reasonable doubt" as to an essential element of the offense charged constituted a concession of guilt); *Jones v. State of Nev.*, 877 P.2d 1052, 1055 (Nev. 1994) (statement during closing argument that "the evidence shows beyond a reasonable doubt that the defendant" was the perpetrator was a concession of guilt); *State of North Carolina v. Harbison*, 337 S.E.2d 504, 505 (1985) (statement by defense counsel that "I don't feel that [the defendant] should be found innocent" was a concession of guilt), *cert. denied*, 476 U.S. 1123 (1986).

Mr. Truman's one statement that the "evidence shows" Applicant knew he was abused, *see (*Dec. 21, 2007 Trial Tr. at 81), does not concede Applicant's guilt.   In the context of the entire closing statement, in which Mr. Truman argues that Applicant could

not know, the one reference to the evidence showing she knew is no more than a misstatement.

The portion of the closing statement at issue here reads as follows:

> If there is a charge of foolishly staying with Alex Midyette, I would urge Molly to plead guilty, but that's not what she is charged with. She is charged with knowing that her boy was being abused and letting it happen or turning a blind eye. That's what she is charged with and that's what the evidence shows . . . .

(Dec. 21, 2007 Trial Tr. at 81.) In the two pages of the trial transcript following this statement, Mr. Truman went on to state as follows:

> I will not get a chance to speak again, but I think that if you take a minute, you will know what Phil or I would say if we had a chance to answer their argument, you will know what our argument and answer would be and I ask you to give that some consideration. I'm anxiously awaiting it. I'm anxiously awaiting to hear how it is that they can have all these bruises, all of them without a single outside artifact, without a bruise, without a fracture. I am anxious to see that.

> I'm anxious to see how it is that if Jill Siegfried and Theresa Jarmul and Michelle Warren, Dr. Fries, if none of them could ever determine that this child was abused, how in this world is Molly to know the difference.

> I'm anxious, to hear those things that Mr. Kupfner said Molly is covering up for Alex and she knew. There is a difference between lawyer argument and evidence. I am anxious to hear one of these lawyers tell you where the evidence is that Molly knew any of this was going on for it's not present, for it's not [to] be introduced to you and was not introduced to you by evidence.

> I am anxious to hear for you to say if Molly is covering up for Alex, why in the hell would she take this kid who could be examined at any time by a trained family practice doc and see these wounds at any time, these wounds, bruises, fractures, never happened. And every time, perhaps this is Ms. Cribari during cross-examination, that, um -- do you remember this question, you picked Dr. Siegfried because she is a boob, right. You picked a doctor who would never see all of this abuse that Alex did to Jason. I'll be anxious to hear if there is any evidence of that. I will wait.

> At the end of this, I think that you will know that Molly couldn't have known. Just as Dr. Jenny said that 31 percent of the trained medical docs

33

couldn't tell a head injury, just as all the docs in this case said they couldn't have seen a thing and would have guessed wrong. If they don't know, how was Molly to know? And if she doesn't know, she's not guilty of all of these charges. If she doesn't know, she's not guilty and you must find her such.

(Dec. 21, 2007 Trial Tr. at 82–83.)

Finally, even if Mr. Truman's reference to the baby as being a victim of child abuse falls below an objective standard of reasonableness under *Strickland,* given the findings at trial that the baby's injuries were conducive to finding a child had been abused, Applicant was not prejudiced by counsel's reference to the baby being abused in the closing statement.

The above findings by the Court support the Colorado Court of Appeals' determination that Mr. Truman's remarks during his closing statement did not state a concession of guilt, were well within the range of reasonableness, and even if not reasonable did not prejudice Applicant. The Colorado Court of Appeals' application of the *Strickland* standard, therefore, was reasonable.

### iii. Conclusion

Based on above findings, the Court has determined that the state court's decision to dismiss these ineffective trial counsel claims set forth in Claim Three was not contrary to or an unreasonable application of any clearly established rule of federal law as determined by the U.S. Supreme Court or a decision that was based on an unreasonable determination of the facts. Claim Three, therefore, lacks merit, and Applicant is not entitled to relief in this claim.

## **V. CONCLUSION**

Based on the above findings, it is

ORDERED that the Application for a Writ of Habeas Corpus Pursuant to 28

U.S.C. § 2254, (Doc. # 1), is DISMISSED WITH PREJUDICE.   It is

FURTHER ORDERED that the issuance of a Certificate of Appealability pursuant to 28 U.S.C. § 2253(a) is denied.   Applicant has not made a substantial showing of the denial of a constitutional right such that reasonable jurists could disagree as to the disposition of her petition pursuant to the standards of *Slack v. McDaniel,* 529 U.S. 473, 484 (2000).   *See* 28 U.S.C. § 2253(c)(2).   It is

FURTHER ORDERED that leave to proceed *in forma pauperis* on appeal is denied.   The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order is not taken in good faith, and, therefore, *in forma pauperis* status is denied for the purpose of appeal.   *See Coppedge v. United States*, 369 U.S. 438 (1962).   If Applicant files a notice of appeal she must also pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* in the United States Court of Appeals for the Tenth Circuit within thirty days in accordance with Fed. R. App. P. 24.

DATED:  April 26, 2018

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge